## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FARLOC ARGENTINA, S.A. ) | Case No. 04-CV-1549 |
| ) | |
| Appellant, ) | On Appeal from an Order of the |
| ) | United States Bankruptcy Court |
| ) | for the District of Delaware in |
| v. ) | Case No. 01-10578 (RTL) |
| ) | |
| FEDERAL-MOGUL GLOBAL INC., ) | Honorable Joseph H. Rodriguez |
| T&N LIMITED, et al., ) | |
| ) | |
| Appellees. ) | **Related Docket No. 5** |
| _____x | |

### BRIEF OF APPELLEES FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, et al.

Counsel for the Appellees:

James F. Conlan
Larry J. Nyhan
Kevin T. Lantry
Kenneth P. Kansa
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Dated: July 1, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................III

BASIS OF APPELLATE JURISDICTION ...............................................................1

STATEMENT OF ISSUES PRESENTED ................................................................1

STANDARD OF APPELLATE REVIEW ................................................................1

STATEMENT OF THE CASE...................................................................................2

   STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ...................................... 2

   STATEMENT OF THE FACTS..................................................................................... 3

SUMMARY OF ARGUMENT ..................................................................................6

ARGUMENT................................................................................................................8

I.   THE BANKRUPTCY COURT APPLIED THE CORRECT LEGAL
STANDARD TO THE DEBTORS' MOTION TO REJECT THE LICENSING
AGREEMENT PURSUANT TO SECTION 11 U.S.C. § 365(A). ...........................8

   A.   WELL-SETTLED CASE LAW DEMONSTRATES THAT THE "BUSINESS JUDGMENT"
STANDARD APPLICABLE TO A DEBTOR'S DECISION TO REJECT AN EXECUTORY
CONTRACT IS IDENTICAL TO THE BUSINESS JUDGMENT STANDARD APPLICABLE
OUTSIDE OF BANKRUPTCY CASES ........................................................................... 9

   B.   THE BANKRUPTCY COURT PROPERLY APPLIED THE BUSINESS JUDGMENT
RULE IN CONSIDERING AND GRANTING THE REJECTION MOTION .................................... 12

   C.   FARLOC'S FORMULATION OF THE BUSINESS JUDGMENT RULE IS BASED UPON
FUNDAMENTAL MISUNDERSTANDINGS OF THE RULE AND ITS OPERATION AND
PURPOSE        .................................................................................................... 15

II.   THE BANKRUPTCY COURT PROPERLY WEIGHED ALL EVIDENCE
PRESENTED BY FARLOC WITH RESPECT TO THE BUSINESS JUDGMENT
STANDARD. ...............................................................................................................19

III.   THE DEBTORS EXERCISED PROPER BUSINESS JUDGMENT IN
DETERMINING THAT REJECTION OF THE LICENSING AGREEMENT WAS
IN THE BEST INTERESTS OF FMP'S ESTATE. ................................................20

   A.   THE DEBTORS' REASONS FOR SEEKING REJECTION OF THE LICENSING
AGREEMENT MORE THAN JUSTIFY THE REJECTION DECISION ........................... 21

   B.   FARLOC DID NOT AND COULD NOT DEMONSTRATE THAT THE DECISION TO
REJECT THE LICENSING AGREEMENT WAS THE PRODUCT OF BAD FAITH, WHIM OR
CAPRICE        .................................................................................................... 23

i

**CONCLUSION** ...................................................................................................................**25**

**STATEMENT OF RELIEF SOUGHT** ....................................................................................**27**

# TABLE OF AUTHORITIES

## CASES

Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985) ....................................................2

Butler v. Resident Care Innovation Corp., 241 B.R. 37 (Bankr. D.R.I. 1999) ...........................16

Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re
    Johns-Manville Corp.), 60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..........................................16

Eagle Ins. Co., v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291
    (1st Cir. 2004) ...................................................................................................17

FDIC v. Stahl, 89 F.3d 1510 (11th Cir. 1996) ............................................................................10

In re At Home Corp., 292 B.R. 195 (N.D. Cal 2003) ...................................................................9

In re Audra-John Corp., 140 B.R. 752 (Bankr. D. Minn. 1992) ....................................................12

In re Balco Equities Ltd., Inc., 323 B.R. 85 (Bankr. S.D.N.Y. 2005) ................................15

In re Bicoastal Corp., 125 B.R. 658 (M.D. Fla. 1991).................................................................11

In re Cellnet Data Systems, Inc., 327 F.3d 242 (3d Cir. 2003) ....................................................2

In re Central Jersey Airport Services, Inc., 282 B.R. 176 (Bankr. D.N.J. 2002) .........9, 12, 18, 19

In re Drehsen, 190 B.R. 441 (M.D. Fla. 1996) ............................................................................1

In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) .................................16

In re Federal-Mogul Global Inc., 293 B.R. 124 (Bankr. D. Del. 2003) ...................6, 8, 11, 13, 23

In re G.I. Indus, Inc., 204 F.3d 1276 (9th Cir. 1999) ...................................................................17

In re III Enters., Inc., 163 B.R. 453 (Bankr. E.D. Pa.) ...........................................7, 10, 12

In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992) ...................................................8

In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993) ...............................................................17

In re Phar-Mor, Inc., 204 B.R. 948 (Bankr. N.D. Ohio 1997) .......................................................9

In re Pillowtex, Inc., 349 F.3d 711 (3d Cir. 2003) ........................................................................1

In re Pinnacle Brands, Inc., 259 B.R. 46 (Bankr. D. Del. 2001) ..................................10

In re Sandman Assocs., 251 B.R. 473 (D. W.D. Va. 2000) ...........................................11

In re Sundial Asphalt Co., 147 B.R. 72 (E.D.N.Y. 1992) ..............................................15

In re Trans World Airlines, Inc., 261 B.R. 103 (Bankr. D. Del. 2001) ...............12, 16, 17, 23

In re W&L Assoc., 71 B.R. 962 (Bankr. E.D. Pa. 1987) ..............................................18

In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845 (Bankr. W.D. Pa. 1987) .............11, 12, 16

Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), cert.
        denied, 475 U.S. 1057 (1986) ..................................................................2, 9, 11

Nat'l Labor Relations Board v. Bildisco (In re Bildisco), 682 F.2d 72 (3d Cir. 1982), aff'd Nat'l
        Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513 (1984) ...........................9

Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp., 872 F.2d 36 (3d Cir. 1989) ..........................2, 9

Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985) .......................................................10

## STATUTES

11 U.S.C. § 365(a) ...................................................................................1, 6, 8
11 U.S.C. § 365(n) ...............................................................................22, 23, 25
11 U.S.C. § 1107(a) ....................................................................................3
11 U.S.C. § 1108 ........................................................................................3

## BASIS OF APPELLATE JURISDICTION

This appeal was taken by Farloc Argentina, S.A. ("Farloc") from that certain Order Granting Debtors' Motion for Order Approving and Authorizing Rejection of Licensing Agreement with Farloc Argentina, S.A. (the "Farloc Rejection Order"), pursuant to a Notice of Appeal filed by Farloc on November 24, 2004. The Farloc Rejection Order was entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on November 18, 2004, and granted the motion of the debtors and debtors-in-possession in the chapter 11 cases below (the "Appellees" or the "Debtors") seeking to reject the Licensing Agreement (as defined below) with Farloc.

## STATEMENT OF ISSUES PRESENTED

1.    Did the Bankruptcy Court err as a matter of law in failing to apply the correct legal standard to the debtor-in-possession's Motion to reject an executory contract pursuant to 11 U.S.C. § 365(a)? (No)

2.    Did the Bankruptcy Court err as a matter of law in failing to weigh the evidence presented with respect to the "business judgment" standard under 11 U.S.C. § 365? (No)

3.    Did the Bankruptcy Court err as a matter of law or fact in granting the Debtors' Rejection Motion? (No)

## STANDARD OF APPELLATE REVIEW

In general, a District Court reviews the factual findings of a Bankruptcy Court for clear error and exercises plenary review over the Bankruptcy Court's legal determinations. See, e.g., In re Pillowtex, Inc., 349 F.3d 711, 716 (3d Cir. 2003). With respect to findings of fact, the burden is upon the appellant to demonstrate that the bankruptcy court's findings are clearly erroneous. See In re Drehsen, 190 B.R. 441, 442 (M.D. Fla. 1996). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire

1

record, is left with the definite and firm conviction that a mistake has been made.  See, e.g., In re
Cellnet Data Systems, Inc., 327 F.3d 242, 244 (3d Cir. 2003).  Where there are two permissible
views of the evidence, the fact finder's choice between them cannot be clearly erroneous.
Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985).

        While a determination of the correct legal standard under which a debtor's
rejection of an executory contract ought to be reviewed is a question of law, the ultimate
determination of whether rejection of an executory contract is justified in any particular situation
is a question of fact.  See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d
1043, 1047 (4th Cir. 1986) (whether a debtor's decision to reject an executory contract was
justified is an "issue ... of fact to be decided as such by the bankruptcy court by the normal
processes of fact adjudication" and review of such a determination is proper under the "clearly
erroneous" standard); In re Sharon Steel Corp., 872 F.2d 36, 38-39 (3d Cir. 1989) (in considering
appeal involving whether to approve lower court decisions concerning rejection of an executory
contract, reviewing court considers choice, application and interpretation of legal precepts *de
novo* but reviews factual determinations on a "clearly erroneous" basis).  As a result, whether the
Bankruptcy Court in this case applied the business judgment standard correctly should be
reviewed *de novo*, but the factual determinations made by the Bankruptcy Court in determining
whether the Debtors' rejection of the Licensing Agreement (as defined below) was proper are
reviewed under a "clearly erroneous" standard.

## STATEMENT OF THE CASE

### STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

        On October 1, 2001 (the "Petition Date"), Appellees commenced their chapter 11
cases by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States
Code (the "Bankruptcy Code").  Since that time, Appellees, together with the Administrators of
those of the Debtors that have voluntarily commenced administration proceedings in the United

2

Kingdom, have continued in possession of their properties and have continued to operate their businesses as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

On October 1, 2004, the Debtors filed their Motion for Order Approving and Authorizing Rejection of Licensing Agreement with Farloc Argentina, S.A. (the "Rejection Motion"), together with the accompanying Declaration of Charles H. Polzin, Associate General Counsel of Federal-Mogul Corporation (the "Polzin Declaration"). (A0001 – A0010; B000001 – B000004).[1] Pursuant to the Rejection Motion, the Debtors sought to reject that certain Licensing Agreement between Farloc and Debtor Federal-Mogul Products, Inc. ("FMP"), as successor for purposes of the Licensing Agreement to Wagner Electric Corporation ("Wagner"). As noted in the Rejection Motion (at ¶ 6; A0003), under the Licensing Agreement Wagner granted Farloc the non-exclusive right to sell approved brake systems and fluid in Argentina under certain trademarks owned by Wagner. In addition, and as also noted in the Rejection Motion (at ¶ 6; A0003), under the Licensing Agreement Wagner granted Farloc an *exclusive* right in Argentina to manufacture brake systems and fluids under trademarks owned by Wagner by means of various manufacturing processes and techniques developed and acquired by Wagner. The Licensing Agreement also permits Farloc to export products from Argentina under the Wagner brand name.

### STATEMENT OF THE FACTS

Both the Rejection Motion and the Polzin Declaration set forth in detail the factual bases for the Debtors' decision to reject the Licensing Agreement. In particular, the Rejection Motion (at ¶ 7; A0003) and the Polzin Declaration (at ¶ 4; B000002) both state that the royalties received by FMP under the Licensing Agreement have been minimal, with such

---

[1] Citations to "A___" herein refer to the designated pages in the Appendix to Opening Brief of Appellant dated January 6, 2005; citations to "B____" herein refer to the designated page or pages in the Appendix to Opening Brief of Appellees dated July 1, 2005. Farloc appears to have omitted the Polzin Declaration from its Appendix, notwithstanding the fact that that Declaration was exhibited to and an integral part of the Rejection Motion, and, accordingly, Appellees have submitted the Polzin Declaration as part of their Appendix.

royalties totaling $49,991 and $27,000 for 2002 and 2003, respectively. Furthermore, both the Rejection Motion and the Polzin Declaration state that in no year since 1998 (the year Wagner was purchased by Federal-Mogul) have the royalties paid to FMP by Farloc under the Licensing Agreement exceeded $100,000.

The Rejection Motion and Polzin Declaration additionally state that the minimal royalties received by FMP under the Licensing Agreement do not justify the broad rights granted to Farloc under the Licensing Agreement, and that such rights (particularly the *exclusive* license granted to Farloc under the Licensing Agreement) effectively prevent or significantly inhibit the Debtors from availing themselves of other, potentially more lucrative business opportunities elsewhere in South America. See Rejection Motion at ¶ 8 (A0004), Polzin Declaration at ¶ 4 (B000002). In addition, the Rejection Motion and Polzin Declaration observe that Farloc's majority shareholder, Dana Argentina, S.A., is a subsidiary of Dana Corporation, which is a significant competitor of the Debtors, particularly in the aftermarket sales of brake systems and brake fluid. See Rejection Motion at ¶ 8 (A0004), Polzin Declaration at ¶ 5 (B000002).[2] As set forth in the Rejection Motion and Polzin Declaration, the Debtors concluded that it was imprudent that one of their major competitors should have control over its Wagner and other valuable trademarks and technology of the Debtors in any market. See id. Accordingly, for all of the foregoing reasons, the Debtors concluded that rejection of the Licensing Agreement served the best interests of the Debtors and their estates.[3] See Rejection Motion at ¶ 8 (A0004), Polzin Declaration at ¶ 6 (B000003).

_____

[2] The Debtors understand that, subsequent to approval of the Rejection Motion and the commencement of this appeal, Dana Corporation sold the Farloc business and certain other businesses to a third party. Even assuming that is true, the relevant issue on this appeal is whether the Debtors properly informed themselves in determining that FMP's rejection of the Licensing Agreement was warranted (a determination in which Dana Corporation's ownership of Farloc was but one factor), and it is unquestionable that the Debtors were properly informed as to Dana Corporation's ownership of Farloc at the time the rejection decision was made.

[3] The Rejection Motion also states that the Debtors assessed the potential damages likely to be legitimately asserted by Farloc as a result of the rejection of the Licensing Agreement. The Debtors concluded, in light of the limited amount of product manufactured, sold, and/or exported

None of the Debtors' several organized constituencies of creditors and interest holders (including the four (4) Official Committees appointed in the Debtors' chapter 11 cases) objected to the Rejection Motion. Farloc, however, filed an objection to the Rejection Motion (the "Objection"), stating, in relevant part, that the Debtors' proposed rejection of the Licensing Agreement should not be approved because it was "not informed by accurate data and because rejection will not benefit the estates, but will actually reduce recoveries for unsecured creditors." Objection at ¶ 14 (A0015). The asserted bases for these contentions were that rejection of the Licensing Agreement would deprive the Debtors' estates of the lost royalties under the Licensing Agreement (i.e., less than $100,000 per annum), reduce the value of the Debtors' minority equity interest in Farloc, and give rise to a claim by Farloc for rejection damages in an amount unspecified by Farloc. See id. at ¶¶ 18-20 (A0017 – A0018). All of these issues relate only to the non-exclusive portions of the Licensing Agreement; Farloc nowhere addressed the Debtors' contentions concerning the undesirability – from the Debtors' perspective – of the *exclusive* license granted under the Licensing Agreement.

The Rejection Motion and Farloc's objection thereto were heard by the Bankruptcy Court at a hearing on November 9, 2004. At that hearing, the Bankruptcy Court overruled Farloc's objection and granted the Rejection Motion. Of relevance to this appeal, the Bankruptcy Court stated that the "business judgment rule … is a presumption that [the debtor's] management has exercised its business judgment, and the Court will not look behind the business judgment unless there is reason to believe that the business judgment … is the product of bad faith or a gross abuse of discretion." Transcript of Nov. 9, 2004 Hearing at 57 (A0120). The Bankruptcy Court then concluded that Farloc had presented no evidence supporting a conclusion that FMP's decision to reject the Licensing Agreement was the product of bad faith, a breach of either the duty of care or duty of loyalty, or a failure by the Debtors' management to educate itself properly concerning the rejection of the Licensing Agreement. See id. at 58 (A0121).

---

by Farloc under the Licensing Agreement, that such damages would be limited. See Rejection Motion at ¶ 9 (A0004).

Following the Bankruptcy Court's issuance of the order approving the Rejection Motion, Farloc filed a motion for stay pending appeal with the Bankruptcy Court, which was opposed by the Debtors. At the hearing on the motion for a stay pending appeal, the Bankruptcy Court reiterated the basis for its original ruling granting the Rejection Motion. See Transcript of Dec. 9, 2004 Hearing at 17-24 (A0197- A0204). In particular, the Bankruptcy Court stated that in the non-bankruptcy context, where a business's directors were sued with respect to a decision they had made, a reviewing court would examine that decision only to see if the plaintiff had alleged in proving facts that would overcome the business judgment rule's presumption that "business decisions are made by disinterested and independent directors on an informed basis, and with the good faith belief that the decisions will serve the best interests of the corporation." See id. at 20 (A0200). The Bankruptcy Court then stated that if the presumption of the business judgment rule were not overcome, the rule prohibited a court from going further in examining the merits of the decision and, in hindsight, second guessing the decisions of directors. See id. The Court concluded by affirming that it had applied the business judgment rule as described above, and denied Farloc's motion for a stay pending appeal.[4] See id. at 23-24 (A0203-A0204).

## SUMMARY OF ARGUMENT

The Bankruptcy Court's decision to authorize the rejection of the Licensing Agreement with Farloc was correct and should be upheld. Although Farloc attempts throughout its brief to confuse the issue, it is settled beyond reasonable dispute that courts defer to the "business judgment" of a debtor to determine whether assumption or rejection of an executory contract or unexpired lease is appropriate under section 365(a) of the Bankruptcy Code. See In re Federal-Mogul Global Inc., 293 B.R. 124, 126 (Bankr. D. Del. 2003). It is also settled beyond any plausible dispute that the business judgment rule is a standard of judicial review for the

---

[4] As a result of the Bankruptcy Court's denial of the stay pending appeal, FMP may reject the Licensing Agreement at any time. In the event FMP elects to do so while this appeal is pending, Appellees reserve the right to present further arguments to the Court that the appeal has become moot as a result of the rejection.

conduct of a debtor's management, and that application of that standard requires a court to presume that decisions are made by disinterested and independent management on an informed basis, and with a good faith belief that the decision will serve the best interest of the debtor. In practice, "[t]he business judgment standard dictates that a court should approve a debtor's business decision unless the decision is the product of bad faith or gross abuse of discretion." See id. at 126. A party opposing the action proposed to be taken by the debtor bears the burden of overcoming the business judgment presumption. See, e.g., In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

As evidenced by the hearing transcript and further evidenced by the Bankruptcy Court's discussion of the matter at the hearing on Farloc's motion for stay pending appeal, the Bankruptcy Court considered whether to approve the Rejection Motion by correctly applying the above standards. In doing so, the Bankruptcy Court correctly concluded that Farloc failed to present sufficient evidence to overcome the presumption that the Debtors' management was disinterested and independent in deciding to reject the Licensing Agreement and made such a decision on an informed basis. After reviewing the Debtors' Rejection Motion and the Polzin Declaration, and the business justifications for rejection of the Licensing Agreement described therein, and after consideration of Farloc's Objection, the Bankruptcy Court properly determined that Farloc had presented nothing that proved that the Debtors' decision to reject the Licensing Agreement was a product of bad faith, a breach of any duty owed by management to the Debtors, or based on a lack of information on the part of the Debtors' management. Accordingly, the evidence in the record shows that the Debtors' decision to reject the Licensing Agreement was based on a valid business justification and the Bankruptcy Court's decision should be upheld.

It is also apparent from the record before this Court that even if the Bankruptcy Court committed any oversights or made any technical errors in approving the Rejection Motion (which, as discussed above, it did not), such errors were harmless. The Debtors set forth a simple and compelling case in the Rejection Motion as to why the Licensing Agreement should be rejected: the minimal financial benefits thereof were more than outweighed by the broad

7

*exclusive* license granted to Farloc under the Licensing Agreement and the fact that the Licensing Agreement allowed substantial amounts of FMP's technology to be accessed by Farloc, which had become a subsidiary of one of the Debtors' major competitors. Such a showing, supported by evidence, more than overcomes any showing necessary to trigger the presumptions of the business judgment rule in favor of the Debtors. In response, Farloc has nowhere made a serious attempt to argue that the Debtors' decision to reject the Licensing Agreement was a product of "bad faith, whim, or caprice," as it must do to prevail in this matter. Rather, Farloc has argued principally that *it* will be harmed by rejection of the Licensing Agreement – a fact wholly irrelevant to the necessary determinations by the Debtors and the Court in this matter – and that that fact should, in effect, allow Farloc to substitute its business judgment for that of the Debtors in determining whether the Licensing Agreement should be rejected. Such an argument is at odds with volumes of well-settled case law on the rejection of executory contracts and with the plain facts of this matter, and should be rejected. The decision of the Bankruptcy Court should be affirmed.

## **ARGUMENT**

### I. THE BANKRUPTCY COURT APPLIED THE CORRECT LEGAL STANDARD TO THE DEBTORS' MOTION TO REJECT THE LICENSING AGREEMENT PURSUANT TO SECTION 11 U.S.C. § 365(a).

The Bankruptcy Court's review of the Debtors' decision to reject the Licensing Agreement was entirely correct and fully consistent with the Bankruptcy Code, voluminous prevailing case law, and the facts before the Court. Specifically, section 365 of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). While the Bankruptcy Code does not specify a particular standard of review to be used by a court in determining whether to approve the assumption or rejection of an executory contract, courts have uniformly applied the so-called "business judgment" standard in evaluating the propriety of a debtor's decision as to assumption or rejection. See Federal-Mogul, 293 B.R. at 126 ("motions

8

to reject executory contracts are evaluated under the business judgment test"); see also Nat'l

Labor Relations Board v. Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd Nat'l

Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513 (1984); Sharon Steel, 872 F.2d at

39-40 (propriety of a debtor-in-possession's decision to reject an executory contract evaluated

under traditional "business judgment test").

> **A.    Well-Settled Case Law Demonstrates that the "Business Judgment" Standard Applicable to a Debtor's Decision to Reject an Executory Contract is Identical to the Business Judgment Standard Applicable Outside of Bankruptcy Cases**

Although Farloc attempts to confuse the issue in its opening brief, the application

of the business judgment standard in the executory contract context is well-recognized and tracks

the application of the business judgment standard to a company's decisions outside of

bankruptcy. As the first step in the process of seeking to reject an executory contract, a debtor is

required to make a showing as to why, in its business judgment, it believes rejection of the

contract in question is beneficial to the debtor's estate. See, e.g., In re At Home Corp., 292 B.R.

195, 199 (N.D. Cal. 2003) ("[b]ankruptcy courts generally approve rejection if the debtor

demonstrates that the rejection will benefit the estate under a 'business judgment' test") (citing

Sharon Steel, 872 F.2d at 39-40); In re Central Jersey Airport Servs., Inc., 282 B.R. 176, 183

(Bankr. D.N.J. 2002) (debtor-in-possession is required to establish that rejection will benefit the

estate as first step in rejection analysis). In other words, a debtor is required to determine

whether or not, in its business judgment, rejection of the contract in question benefits the estate,

and then to articulate the bases for that determination. See Lubrizol, 756 F.2d at 1046-47

(whether an executory contract is favorable or unfavorable is left to the sound business judgment

of the debtor); In re Phar-Mor, Inc., 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) (same). In

the instant cases, as discussed in section III.A, *infra*, the Debtors made such a showing to the

Bankruptcy Court in this case via the Rejection Motion and supporting Polzin Declaration.

Once a debtor articulates a valid business justification for its assumption or rejection decision, courts employ the "business judgment" standard in evaluating any challenge to that decision. <u>See, e.g.</u>, <u>In re Pinnacle Brands, Inc.</u>, 259 B.R. 46, 53-54 (Bankr. D. Del. 2001) ("[t]he usual test is for rejection of an executory contract is simply whether rejection would benefit the estate, [under] the business judgment test") (addition in original). Stated succinctly, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" <u>In re Integrated Resources, Inc.</u>, 147 B.R. at 656 (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)). In the proceedings below, the Bankruptcy Court described the "business judgment" test as follows:

> The Business Judgment Rule is a standard of judicial review for director conduct not a standard of conduct. The Rule presumes that business decisions are made by disinterested and independent directors on an informed basis, and with a good faith belief that the decision will serve the best interest of the corporation.

<u>See</u> Transcript of Dec. 9, 2004 Hearing at 20 (A0200) (<u>quoting</u> NANCY E. BARTON, ET AL., BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS (5th ed. 2002)).[5]

Numerous courts have made clear that the business judgment rule as applied in the context of a motion to reject under section 365 of the Bankruptcy Code is precisely the same

---

[5] The Bankruptcy Court went on to explain that under the business judgment rule, there is a presumption that:

> business decisions are made by disinterested and independent directors on an informed basis, and with the good faith belief that the decisions will serve the best interests of the corporation. If the presumption has not been overcome, then the Business Judgment Rule prohibits the Court from going further in examining the merits of the underlying business decision, and prevents a fact finder, in hindsight, from second guessing the decisions of directors.

<u>See</u> Transcript of Dec. 9 Hearing at 20 (A0200) (<u>quoting</u> NANCY E. BARTON, ET AL., BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS (5th ed. 2002) and relying upon <u>FDIC v. Stahl</u>, 89 F.3d 1510 (11th Cir. 1996)).

as the business judgment rule quoted above. Indeed, one of the most prominent opinions setting

forth this rule is <u>Lubrizol</u>, upon which Farloc relies heavily – and wrongly – for the proposition

that the business judgment rule in the executory contracts context differs from the corporate

business judgment rule. <u>See</u> Appellant's Brief at 15. The language of <u>Lubrizol</u> is very clear:

courts addressing the question of whether rejection of an executory contract would be

advantageous to a debtor "must start with the proposition that the bankrupt's decision is to be

accorded the deference mandated by the sound business judgment rule as generally applied by

courts to discretionary actions or decisions of corporate directors." 756 F.2d at 1046-47. This is

precisely the standard applied by the Bankruptcy Court below.

   The logic of <u>Lubrizol</u> has been followed in numerous other cases as well. <u>See,</u>

<u>e.g.</u>, <u>In re Sandman Assocs.</u>, 251 B.R. 473, 481 (W.D. Va. 2000) (stating that the "sound

business judgment rule" provides the same deference to a decision to reject an executory contract

as is given to other business management actions or decisions); <u>In re Bicoastal Corp.</u>, 125 B.R.

658, 667 (M.D. Fla. 1991) (stating that "[i]t is widely accepted that when a court reviews the

rejection of an executory contract 'the generally accepted standard. . . is the business judgment

rule, the same test applied to judicial review of corporate decision-making in other contexts. . .

.'"). Farloc's contention in its brief to the contrary – namely, that the business judgment rule to

be applied in the executory contracts context is somehow different than the standard business

judgment rule – is thus not merely false but contradicted by the very case law on which is it

alleged to be based.

   As a result of applying the business judgment rule to evaluate a debtor's decision

to reject an executory contract, courts will summarily affirm a debtor's decision to reject an

executory contract unless the decision is shown to be the product of bad faith or a gross abuse of

discretion by the debtor; <u>i.e.</u>, unless the debtor abused its business judgment. <u>See, e.g.</u>, <u>Federal-</u>

<u>Mogul</u>, 293 B.R. at 124 (court will approve debtor's decision to reject executory contract unless

debtor's decision is the product of bad faith or a gross abuse of discretion); <u>In re Trans World</u>

<u>Airlines, Inc.</u>, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("[a] debtor's decision to reject an

11

executory contract must be summarily affirmed unless it is the product of 'bad faith, whim, or caprice'"); In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987) (a "court should not interfere with or secondguess the debtor's sound business judgment unless and until evidence is presented that the debtor's decision was one taken in bad faith or in gross abuse of its retained discretion").

A mere contention that the debtor has made a bad business decision is insufficient to establish "bad faith, whim, or caprice" and hence upset a debtor's business judgment in deciding to seek rejection of an executory contract. See TWA, 261 B.R. at 121 (claim that debtor has made an unwise business decision is insufficient as a matter of law to deny debtor's exercise of business judgment in seeking to reject an executory contract); Wheeling –Pittsburgh, 72 B.R. at 849 ("…whether the debtor is making the best or even a good business decision is not a material issue of fact under the business judgment test"). Instead, courts will generally defer to a debtor's decision to reject an executory contract, and upset such a decision only in extreme circumstances. See, e.g., In re III Enters., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa.) ; aff'd, 169 B.R. 551 (E.D. Pa. 1994) ("generally, a court will give great deference to a debtor's decision to assume or reject, an executory contract"). The burden of demonstrating that the debtor's decision stems from "bad faith, whim, or caprice" falls on the non-debtor party opposing rejection of the contract. See Central Jersey Airport Servs., 282 B.R. at 183 (citing In re Audra-John Corp., 140 B.R. 752, 759 (Bankr. D. Minn. 1992)); In re Integrated Resources, Inc., 147 B.R. at 656.

### B. The Bankruptcy Court Properly Applied the Business Judgment Rule in Considering and Granting the Rejection Motion

The case law described above, which is settled so as to be beyond reasonable dispute, sets out the business judgment rule and its operation plainly. The Debtors were required to make a showing as to their basis for seeking to reject the Licensing Agreement. Once such a showing was made, the Bankruptcy Court was required as a matter of law to presume that the

Debtors made such a decision in good faith and in the best interests of FMP's estate. The burden

of proof then shifted to Farloc to demonstrate that the Debtors' decision to reject the Licensing

Agreement was made in bad faith and or was the result of whim, caprice, or a comparable abuse

of discretion. See, e.g., Central Jersey Airport Servs., 282 B.R. at 183 (describing shifting of

legal burdens as a result of business judgment rule presumption).

       The Bankruptcy Court properly concluded, as evidenced by the record on appeal,

that the Debtors carried their burden and Farloc wholly failed to carry its burden. In particular,

the Bankruptcy Court's ruling and colloquy with Farloc's counsel at the hearing on the Rejection

Motion make clear that the Bankruptcy Court had considered the facts set forth by the Debtors in

the Rejection Motion including, *inter alia*, the nature of the Licensing Agreement and the

minimal revenue stream received by FMP thereunder. See Transcript of Nov. 7 Hearing at 56

(A0119) (discussing factual background of Licensing Agreement). On the record and evidence

before it (as summarized at pp. 3-6, *supra*), the Bankruptcy Court was well able to conclude that

the Debtors satisfied their burden to show benefit to FMP's estate by rejection of the Licensing

Agreement.

       As a result, the Bankruptcy Court properly required Farloc to demonstrate that the

Debtors acted in bad faith or otherwise abused their discretion in deciding to reject the Licensing

Agreement. The Bankruptcy Court held that Farloc did not satisfy this burden. Specifically,

when addressing the legal standard upon which the Bankruptcy Court relied with respect to its

decision to approve the Debtors' rejection of the Licensing Agreement, the Bankruptcy Court

correctly explained that:

> [i]t's not the role of the court to substitute its judgment for that of
> the management of the debtor. The role should be to make sure
> that management of the debtor in possession has made a proper
> business judgment. And the way the business judgment rule works
> in the non bankruptcy context is that there is a presumption that
> management has exercised its business judgment, and the Court
> will not look behind the business judgment unless there is reason
> to believe that the business judgment in the words of Judge Wolin,
> is the product of bad faith or a gross abuse of discretion.

See Transcript of Nov. 9, 2004 Hearing at 57 (A0120) (referencing Federal-Mogul, 293 B.R. at

126). In short, the Bankruptcy Court applied the business judgment rule precisely as set forth in

overwhelming case law: the Debtors, upon making their showing of benefit to FMP's estate from

the rejection, received the benefit of the business judgment rule's presumption that such action

was taken in good faith, which then fell to Farloc to overcome by showing that the Debtors had

acted in bad faith or out of whim or caprice.

        Completing its necessary findings, the Bankruptcy Court then made explicit that

Farloc had not carried its burden:

> In this case there's nothing that the objector has presented which
> would leave [sic] the Court to conclude that there was any bad
> faith or any breach of the duty of loyalty on behalf of the
> management of the debtor. Nor is there any demonstration that the
> management of the debtor failed to properly educate itself
> regarding the decision to reject this executory contract.

See Transcript of Nov. 9, 2004 hearing at 57-58 (A0120-A0121). In other words, on the facts

before it, the Bankruptcy Court concluded that Farloc nowhere demonstrated that the Debtors'

decision for FMP to reject the Licensing Agreement was taken in bad faith. Indeed, Farloc's

counsel conceded as much at the hearing, saying: "I don't know that we can establish there's any

bad faith." Transcript of Nov. 9, 2004 hearing at 54 (A0117).

        In addition, although Farloc contends that the Bankruptcy Court's references to

breaches of the duties of loyalty and care are evidence that the Bankruptcy Court misapplied the

applicable legal standard (see Appellant's Brief at 12-13), when read in context the Bankruptcy

Court's reference to such breaches is clearly used to exemplify the type of bad faith or abuse of

discretion that might rise to the level required in order successfully to oppose a rejection motion,

and that the reference is not to such breaches as standards to be applied by themselves. In other

words, the Bankruptcy Court concluded that Farloc nowhere demonstrated that the Debtors'

decision was the product of the sort of abuse of discretion that would be necessary for Farloc to

overcome the business judgment presumption in favor of the Debtors. That decision was the

14

product of a correct application of the business judgment rule, and should be upheld on this appeal.

### C. Farloc's Formulation of the Business Judgment Rule is Based Upon Fundamental Misunderstandings of the Rule and its Operation and Purpose

Farloc's principal argument on appeal is that the Bankruptcy Court improperly applied the business judgment rule to the Rejection Motion by affording the Debtors the benefit of the presumption of reasonableness under the traditional formulation of the rule. See Appellant's Brief at 10, 15. In support of that argument, however, Farloc offers no alternative construct of the business judgment rule, but instead sets forth a mishmash of legal principles relating to a Bankruptcy Court's review of a debtor's decision to reject an executory contract, and argues that a reviewing court must determine "whether the proposed rejection benefits the estate" and "examine the debtor's decision and evaluat[e] its reasonableness in the light of results." Appellant's Brief at 15.

This argument simply misses the point. It is indisputable that a court considering a debtor's motion to reject an executory contract should consider whether the proposed rejection benefits the estate, but the question before this Court on appeal goes to *what standard of review a court should employ in making that determination.* The Bankruptcy Court below determined correctly that the Debtors' management was better positioned to evaluate the benefits of rejecting the Licensing Agreement than the Bankruptcy Court, and accordingly held that the Bankruptcy Court would not substitute its judgment for that of the Debtors unless the Debtors were shown to have made their decision in bad faith or as a gross abuse of discretion. See Transcript of Nov. 9, 2004 Hearing at 57 (A0120) ("the Court will not look behind the business judgment unless there is reason to believe that the business judgment in the words of Judge Wolin, is the product of bad faith or a gross abuse of discretion"). This deferential standard of review is overwhelmingly supported in the case law. See, e.g., In re Balco Equities Ltd., Inc., 323 B.R. 85 (Bankr. S.D.N.Y. 2005) ("[a] court 'should defer to a debtor's decision that rejection of a contract would

15

be advantageous unless the decision is so unreasonable that it could not be based on sound

business judgment, but only on bad faith or whim') (citing In re Sundial Asphalt Co., 147 B.R.

72, 83-84 (E.D.N.Y. 1992)); TWA, 261 B.R. at 121 ("[a] debtor's decision to reject an executory

contract must be summarily affirmed unless it is the product of 'bad faith, whim, or caprice'");

Butler v. Resident Care Innovation Corp., 241 B.R. 37, 47 (D.R.I. 1999) (same); Wheeling-

Pittsburgh, 72 B.R. at 849 (in reviewing debtor's decisions to accept or reject executory

contracts, courts ordinarily "accord the debtor's business judgment a great deal of deference

since the decision to assume or reject an executory contract is an administrative not a judicial

matter").

        This high standard of deference to the decisions of a debtor's management is not

just supported by a volume of case law, but is also well-grounded in bankruptcy policy. Put

succinctly, the Bankruptcy Code strongly favors the continued operation of businesses by

debtors-in-possession and recognizes that they are likely to be better positioned than courts or

third parties to make judgments concerning those businesses. See Committee of Asbestos-

Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R.

612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation

of a business by a debtor and a presumption of reasonableness attaches to a debtor's management

decisions"); accord In re Farmland Indus., Inc., 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003).

Indeed, the Bankruptcy Court made plain that its ruling was based on the fact that the Court's

judgment should not be substituted for that of the Debtors, noting at the December 7 Hearing that

courts "are ill equipped" to make decisions respecting a debtor's business and that, as a result,

courts should give "the corporate management the benefit of its decision, and place the burden

on the objector to show that that presumption should no longer apply." Transcript of Dec. 7,

2004 Hearing at 21 (A0201).

        Against all of these considerations and the overwhelming weight of case law,

Farloc offers little. It notably fails to come to grips with the questions of what the business

judgment standard is (in its view) and how that standard ought to be applied. Instead, Farloc

retreats to its assertions that a debtor is required to demonstrate benefit to the estate and take into account the interests of third-party creditors in determining whether or not to reject an executory contract,[6] which are correct in so far as they go but say absolutely nothing about how a court ought to evaluate whether those showings have been made, which – as court upon court has concluded – should be through application of the traditional business judgment rule.

        Farloc also appears to assert throughout its brief that a bankruptcy court is required to engage in a detailed analysis of each of a debtor's decisions to assume or reject an executory contract. See Appellant's Brief at 15 (asserting that a court's analysis should "examin[e] the debtor's *decision* and evaluat[e] its reasonableness in light of results") (emphasis in original); 15-16 ("in determining whether a rejection decision is a reasonable exercise of a debtor's business judgment, the Court is bound not merely to make a cursory analysis of the debtor's decision making process, but to ensure that the debtor has demonstrated that it engaged in a decision making process that provides conceivable benefits to the debtor's <u>estate</u> and creditors") (emphasis in original). That assertion is contrary to well-established case law and the well-grounded practice of bankruptcy courts. Court upon court has held that a debtor's showing of benefit to the estate from rejection of a particular contract is not intended to be an exhaustive one. Instead, "a motion to reject is a summary proceeding that involves only a cursory review of a trustee's [or debtor's] decision to reject the contract." In re G.I. Indus., Inc., 204 F.3d 1276, 1282 (9th Cir. 1999); see also Eagle Ins. Co., v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291, 302 (1st Cir. 2004) (a motion to assume or reject an executory contract "should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate") (quoting In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Bankruptcy Court in Delaware has adopted this view as well. See TWA,

---

[6] Although Farloc attempts to appeal to "the interests of third party creditors" in support of its argument that rejection of the Licensing Agreement was unwarranted, it is telling that none of the four (4) Official Committees of third party creditors and interest holders appointed in the Debtors' bankruptcy cases opposed the Rejection Motion, nor did any other party besides Farloc.

261 B.R. at 121 ("[a] debtor's decision to reject an executory contract *must be summarily affirmed* unless it is the product of 'bad faith, whim, or caprice'") (emphasis added). Farloc nowhere attempts to overcome or distinguish any of this law, instead relying on a series of cases that merely restate the proposition that rejection of a contract must be in the best interests of the estate, which again says nothing about how a court should go about evaluating whether that is the case.[7]

It is also clear as a practical matter that courts have not, and could not, conduct the sort of extensive, searching inquiry that Farloc appears to believe must accompany rulings on every motion to reject an executory contract. In the course of a single chapter 11 proceeding, a corporate debtor may have to make determinations as to whether to assume or reject hundreds (if not thousands or more) executory contracts. If courts were charged with the task of performing a detailed review of each such determination (as Farloc contends they are), bankruptcy courts would likely accomplish little else. Farloc's analysis simply cannot be correct.

---

[7] One of the cases relied upon by Farloc, however, sharply undercuts Farloc's position by making plain the low standard that the business judgment rule imposes on a debtor-in-possession and the types of business decisions that might fail to satisfy the rule.

> We believe that a debtor-in-possession (hereinafter referred to as "DIP") has great latitude in deciding whether to reject an executory contract and that the court should reject the DIP's judgment only if the low threshold which the DIP must clear to obtain court approval of a proposed agreement to compromise a claim of a creditor via a settlement need be cleared in order to satisfy the "business judgment test." ... We would be inclined to refuse a DIP's Motion to reject an executory contract on the ground that it failed the "business judgment test" only if there is some element of insider profit at the expense of the estate (we find insider profit here but no expense of same to the estate) or valid disinterested creditor opposition (which is not present).

In re W&L Assocs., 71 B.R. 962, 967 (Bankr. E.D. Pa. 1987). This passage makes clear that although Farloc is correct when it observes that a debtor must articulate why it believes that rejection of a particular contract will benefit the estate (as the Debtors did in the Rejection Motion), courts will give great deference to the debtor's determinations and will disturb them only in extreme circumstances (such as insider profiteering that damages the estate or the opposition of disinterested creditors).

Instead, the business judgment rule has evolved to address precisely this issue, by requiring debtors to make a showing that assumption or rejection of the contract will benefit the estate, and then shifting the burden to parties opposing the assumption or rejection to demonstrate that the decision stems from bad faith, whim or caprice. See, e.g., Central Jersey Airport Servs., 282 B.R. at 183 (describing shifting of legal burdens as a result of business judgment rule presumption). The low burden placed on the debtor and the substantial burden placed on the opposing party have been crafted by courts to ensure that debtors-in-possession, as the best-positioned parties to understand the debtor's business and affairs, are afforded the latitude necessary in managing the debtor's affairs to maximize the prospects of a successful reorganization – the ultimate aim of the bankruptcy process. Farloc never considers, much less refutes, these fundamental principles in its brief. As a result, its arguments on appeal should be rejected.

## II.    THE BANKRUPTCY COURT PROPERLY WEIGHED ALL EVIDENCE PRESENTED BY FARLOC WITH RESPECT TO THE BUSINESS JUDGMENT STANDARD.

Having failed to demonstrate that the Court made any errors in applying the business judgment standard to rejection of the Licensing Agreement, Farloc next claims that the Court summarily rejected relevant testimony from Farloc without evaluating its potency. See Appellant's Brief at 19. This argument is both false and plainly contradicted by the record. As an initial matter, Farloc offered no evidence or testimony beyond the exhibits to its Objection, and none of those exhibits were excluded or dismissed by the Bankruptcy Court. As a result, Appellees are uncertain what Farloc believes may have been summarily rejected, given that it offered nothing that was not accepted by the Bankruptcy Court.

What is certain is that the Bankruptcy Court considered the allegations in Farloc's objection and its supporting documents and held that they were insufficient to demonstrate that the Debtors' decision to reject the Licensing Agreement was the product of bad faith or a gross abuse of discretion. As the Bankruptcy Court stated:

19

> In this case there's nothing that the objector has presented which
> would leave [sic] the Court to conclude that there was any bad
> faith or any breach of the duty of loyalty on behalf of the
> management of the debtor. Nor is there any demonstration that the
> management of the debtor failed to properly educate itself
> regarding the decision to reject this executory contract.

See Transcript of Nov. 9, 2004 hearing at 57-58 (A0120-A0121). These statements demonstrate

that the Bankruptcy Court properly evaluated the pleadings and evidence before it – as

supplemented by Farloc's explanation of its position at oral argument – and concluded that

Farloc had not carried its burden of proving that the Debtors' decision to have FMP reject the

Licensing Agreement was the product of either a breach of management's duties to the Debtors

nor management's failure to make an informed decision concerning rejection of the Licensing

Agreement. Farloc cannot now attempt to manufacture grounds for appeal by alleging that the

Bankruptcy Court excluded purely hypothetical evidence on Farloc's behalf, when the record is

clear that the Bankruptcy Court properly evaluated the evidence before it.

III.    **THE DEBTORS EXERCISED PROPER BUSINESS JUDGMENT IN
        DETERMINING THAT REJECTION OF THE LICENSING AGREEMENT WAS
        IN THE BEST INTERESTS OF FMP'S ESTATE.**

Finally, Farloc argues that the record supports a conclusion that the Debtors'

decision to reject the Licensing Agreement was, in Farloc's view, "an act of whim or caprice"

and "capricious and manifestly unreasonable." See Appellant's Brief at 11, 21. That contention

is false. The Debtors showed to the Court below – and demonstrate again here – that the

decision to reject the Licensing Agreement was amply supported by the evidence in the record

and more than justified the Bankruptcy Court's conclusion that rejection was in the best interests

of the Debtors' estates and the decision was not a product of "bad faith, whim, or caprice," which

would have to be found in order for Farloc's position to be defensible.

20

A.    **The Debtors' Reasons For Seeking Rejection of the Licensing Agreement More than Justify the Rejection Decision**

The Debtors' reasons for seeking to have FMP reject the Licensing Agreement are set forth clearly and in detail in the Rejection Motion and the Polzin Declaration. In those pleadings, the Debtors noted that the Licensing Agreement provided FMP with an exceedingly small benefit: from 1998 through 2003, the revenues received by FMP under the Licensing Agreement never exceeded $100,000 in any year. See Polzin Declaration at ¶ 4 (B000002). Indeed, although Farloc has argued that the Licensing Agreement and the royalties received thereunder are substantial assets of FMP's estate,[8] Farloc's own evidence submitted in support of its Objection belies that assertion. Assuming *arguendo* that Farloc's information set forth on Exhibit C to the Objection is accurate (A0043–A0049), FMP received only $34,243.00 in after-tax royalties in 2003 from Farloc under the Licensing Agreement, and has only received $459,943.00 in after-tax royalties under the Licensing Agreement *for the past decade.* See Reply of Debtors and Debtors-in-Possession to Objection of Farloc Argentina S.A. to Debtors' Motion for Order Approving and Authorizing Rejection of Licensing Agreement at ¶ 3 (A0058-A0059). In contrast, as noted in the Debtors' reply to Farloc's objection, FMP's net income in 2003 was $37.3 million, according to the Debtors' public filings. As a result, the royalty payments by Farloc to FMP under the Licensing Agreement, measured on a net-net basis, accounted for well less than one-tenth of one percent (>0.001) of FMP's 2003 income.

Although the benefits to the Debtors from the Licensing Agreement are exceedingly small, the rights granted to Farloc thereunder are substantial. As noted by the Debtors in the proceedings below, the Licensing Agreement provides Farloc with both a non-exclusive license to sell certain brake systems and fluid in Argentina and an exclusive license to manufacture certain brake systems and fluid in Argentina for sale in Argentina. See Licensing Agreement at ¶¶ 3-4 (A0030); Rejection Motion at ¶ 8 (A0004); Polzin Declaration at ¶ 4

---

[8] See, e.g., Objection at ¶ 14 (A0015) (asserting that "the proposed rejection would result in the loss of a significant revenue stream...").

(B000002). The brake systems and fluid covered by the exclusive license are those "constructed or produced in accordance with the designs and formulas, and by means of the manufacturing practices and techniques developed and acquired by [FMP] and [FMP] agrees not to authorize anyone else to manufacture said brake systems and fluid in Argentina, nor disclose said construct." Licensing Agreement at ¶ 4 (A0030). The exclusive license, as a result, both (i) inhibits the Debtors' development of their business in Argentina specifically and South America in general by preventing the Debtors from entering into any agreements that might be inconsistent with the exclusive license, and (ii) would arguably permit Farloc, which is majority-owned by Dana Corporation, one of the Debtors' principal competitors, to access all of FMP's manufacturing techniques and processes for brake systems.

Accordingly, and as the Debtors demonstrated to the Bankruptcy Court, the Licensing Agreement requires the Debtors to provide Farloc with substantial benefits in exchange for an exceedingly small stream of revenue, while inhibiting the Debtors' ability to pursue their business plan. This is precisely the sort of scenario in which a debtor should exercise its powers afforded under the Bankruptcy Code to reject an executory contract – the Licensing Agreement imposes burdens upon FMP wholly out of proportion with any benefits thereunder. That imbalance was the principal reason the Debtors moved to reject the Licensing Agreement. See Rejection Motion at ¶ 8, 14 (A0004, A0007); Polzin Declaration at ¶ 4 (B000002).

In addition to identifying both the substantial burdens imposed on FMP by the Licensing Agreement and the minimal benefits afforded thereunder, the Debtors also analyzed Farloc's potential damage claims that might arise from rejection of the Licensing Agreement. In the Debtors' view, such damage claims are likely to be limited, given that Missouri law – the law specified in the Licensing Agreement as its governing law – is likely to limit the amount of time for which Farloc could reasonably assert damages to one (1) year following rejection of the Licensing Agreement. See Rejection Motion at ¶ 9 (A0004). The Debtors further determined that Farloc would not be able to invoke section 365(n) of the Bankruptcy Code to continue using

22

FMP's trademarks following rejection of the Licensing Agreement, and might also not be able to use section 365(n) to continue to access information about FMP's manufacturing processes.[9] See id. at ¶ 15 (A0007).

The foregoing facts, all of which were before the Bankruptcy Court prior to the hearing on the Rejection Motion, demonstrate beyond dispute that the Debtors exercised sound business judgment in deciding to reject the Licensing Agreement and carried their burden of showing benefit to FMP's estate from the rejection. As a result, the Debtors' decision to reject the Licensing Agreement was, under prevailing case law (discussed *supra* at section I.A), to be summarily affirmed by the Bankruptcy Court unless that decision was shown by Farloc to be the product of bad faith or an gross abuse of discretion on the Debtors' part. See Federal-Mogul, 293 B.R. at 126 (court will approve debtor's decision to reject executory contract unless debtor's decision is the product of bad faith or a gross abuse of discretion); Trans World Airlines, Inc., 261 B.R. at 121 ("[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, whim, or caprice'").

**B.    Farloc Did Not and Could Not Demonstrate that the Decision to Reject the Licensing Agreement was the Product of Bad Faith, Whim or Caprice**

Farloc entirely failed to carry its burden to demonstrate that the decision to reject the Licensing Agreement was the product of bad faith, whim, or caprice. In its brief, Farloc makes several cursory contentions as to why it believes the decision to reject the Licensing Agreement was "capricious and manifestly unreasonable" (Appellant Brief at 21); however, none of these contentions withstands serious scrutiny.

---

[9] Section 365(n) of the Bankruptcy Code provides, in brief, that in the event an executory contract under which a debtor is a licensor of intellectual property is rejected by that debtor, the licensee may elect in certain circumstances to retain its rights to that intellectual property. See 11 U.S.C. § 365(n). As stated in the Motion, the Debtors concluded that the likely period in which Farloc could continue to access FMP's technology under section 365(n), if any, would be brief.

First, Farloc alleges that it will sustain "substantial damages" upon rejection of the Agreement, which Farloc apparently believes was an issue not considered by either the Debtors or the Bankruptcy Court.[10] The record, however, demonstrates otherwise: the Debtors, as set forth in their pleadings in the Court below and as discussed in the preceding section, disagreed with Farloc's contentions as to the extent of its projected damages and concluded that Farloc's rejection damages would be limited at best.[11] Accordingly, it is indisputable that the Debtors had Farloc's allegations as to the scope and extent of its projected future rejection damages before them in making the rejection decision, analyzed those allegations, and found them not credible. That sort of consideration prevents the Debtors' rejection decision from rising to the level of "bad faith, whim, or caprice."

Farloc's further contention that the Debtors are "cutting off a costless revenue stream" by rejecting the Licensing Agreement is both erroneous and exposes the central flaw in Farloc's analysis of this entire matter. In fact, the *de minimis* revenue stream under the Licensing Agreement comes with substantial costs to the Debtors; namely, the costs of leaving the exclusive portions of the Licensing Agreement in place and continuing to allow one of the Debtors' major competitors to have access to the technology licensed thereunder. Farloc's refusal to acknowledge these costs and evaluate them eviscerates its analysis. In contrast, the Debtors' management balanced those costs on the one hand against the tiny fraction of FMP's

---

[10] Although Farloc alleges that it "established that rejection was likely to result in very significant rejection damages and a reduction in the value of the estates' assets" in the proceedings in the Bankruptcy Court (Appellant's Brief at 22), Farloc in fact did no such thing. Instead, Farloc merely asserted a litigation position as to what it believed its rejection damages would be. Farloc cannot somehow convert its mere contentions into an "establishment" of its views on rejection damages by merely saying so.

[11] For example, the Debtors observed to the Bankruptcy Court that Farloc's assertion that large rejection damages will result from rejection of the Licensing Agreement is based on the entirely unsupported assertion in the Objection that Argentine law will govern the measure of rejection damages, rather than Missouri law as specified in the Licensing Agreement. See Licensing Agreement at ¶ 33 (A0041) (specifying that United States law in general and Missouri law in particular governs License Agreement).

income resulting from the Licensing Agreement on the other hand, and concluded that the costs outweighed the benefits such that the Debtors' estates would be enhanced in the long term by rejection of the Licensing Agreement. Such a decision was well within the expertise and judgment of the Debtors' management, and Farloc should not now be permitted to substitute its business judgment (which is necessarily informed by Farloc's self-interest) for that of the Debtors.

Finally, Farloc alleges that its rights under section 365(n) of the Bankruptcy Code "mean that Farloc will not be deprived of the benefits of the [exclusive technology] license for an indeterminate period." Appellant's Brief at 22. Once again, however, this argument both attempts to restate an unsupported allegation of Farloc as fact and wholly ignores the fact that the Debtors considered this issue in making their rejection decision. The Rejection Motion sets forth the Debtors' views that (i) section 365(n) would not entitle Farloc to the continued use of any trademarks, as trademarks are outside the scope of "intellectual property" under the Bankruptcy Code, (ii) it is at best debatable whether Farloc would have any rights to the Debtors' manufacturing processes for Wagner products under section 365(n), and (iii) the period during which Farloc could use any intellectual property in which it had section 365(n) rights would likely be limited to one year at most. See Rejection Motion at ¶¶ 15-16 (A0007-A0008). The discussion of these facts in the Rejection Motion demonstrates beyond dispute that the Debtors considered these issues in making the decision to reject the Licensing Agreement and determined that such decision was nonetheless warranted. Accordingly, the Debtors' management adequately informed themselves on this issue prior to seeking Bankruptcy Court approval for rejection of the Licensing Agreement, and there is no basis on which Farloc can now credibly allege that a failure to do so that rises to the level of "bad faith, whim or caprice" occurred.

## CONCLUSION

The Debtors decided that FMP should reject the Licensing Agreement for simple, basic reasons:  the decades-old agreement no longer generates sufficient revenue to warrant the

broad, exclusive license granted to Farloc thereunder, provides broad rights to a competitor of the Debtors, and no longer comports with the Debtors' business plan. In evaluating that decision, the Bankruptcy Court correctly applied the business judgment standard and correctly concluded that the Debtors had satisfied their burden to articulate a proper basis for their business decision, for all of the reasons stated in the Rejection Motion and the Polzin Declaration. It thus became Farloc's burden to demonstrate that the decision to reject the Licensing Agreement was the product of "bad faith, whim or caprice," a burden the Bankruptcy Court correctly concluded that Farloc did not come close to carrying. The Bankruptcy Court's analysis was indisputably correct, and this Court should affirm the Bankruptcy Court's order.

## STATEMENT OF RELIEF SOUGHT

For all the foregoing reasons, Appellees Federal-Mogul Global Inc., T&N

Limited et al. respectfully request that this Court affirm the Bankruptcy Court's judgment.

Dated: Wilmington, Delaware  
          July 1, 2005

Respectfully submitted,

SIDLEY AUSTIN BROWN & WOOD LLP  
Larry J. Nyhan  
James F. Conlan  
Kevin T. Lantry  
Kenneth P. Kansa  
Bank One Plaza  
10 South Dearborn Street  
Chicago, Illinois  60603  
(312) 853-7000

-and-

PACHULSKI, STANG, ZIEHL, YOUNG,  
JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)  
James E. O'Neill (Bar No. 4042)  
919 North Market Street, 16th Floor  
P.O. Box 8705  
Wilmington, Delaware 19899-8705 (Courier 19801)  
Telephone:  (302) 652-4100  
Facsimile:  (302) 652-4400

Attorneys for Appellees Federal-Mogul  
Global Inc., T&N Limited, et al.